UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Criminal No. 12-0074 (RBW) |
| | : | |
| v. | : | |
| | : | |
| **JORGE RODRIGUEZ,** | : | |
| **Defendant.** | : | |
| | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.[1] For the reasons set forth herein, the government recommends that the Court accept the parties agreed-upon sentence of 125 months incarceration, pursuant to Fed. R. Crim. P. 11(c)(1)(C) (with respect to the incarceration aspect of sentencing), to be followed by at least 120 months (10 years) of supervised release with the condition that the defendant undergo intensive sex offender treatment, as well as all additional conditions deemed appropriate by the Court and by U.S. Probation, including conditions relating to computer and internet usage and contact with children.

**I.    PROCEDURAL BACKGROUND**

1.    On November 16, 2012, the defendant Jorge Rodriguez pled guilty pursuant to a plea agreement to one count of Transportation of Child Pornography, in violation of Title 18, United States Code, Section 2252(a)(1).

---

[1] In separate sealed filings, the government also filed with the Court victim impact statements in this case, as well as a request for restitution by one particular victim of a "known series" of child pornography.

2.      The defendant's plea was pursuant to a Fed. R. Crim. P. 11(c)(1)(C) plea agreement with the government in which the parties have agreed that a sentence of 125 months incarceration is appropriate with respect to the incarceration aspect of the defendant's sentence.[2]

3.      In the Presentence Investigation Report, and consistent with the parties' plea agreement in this case, the defendant's base offense level was 22, which was increased by 2 levels because the material involved a prepubescent minor or minor below the age of 12 (U.S.S.G. § 2G2.2(b)(2)); by an additional 2 levels because the offense involved distribution not otherwise described in the applicable subsection (U.S.S.G. § 2G2.2(b)(3)(F)); by an additional 4 levels because the material portrayed sadistic or masochistic conduct or other depictions of violence (U.S.S.G. § 2G2.2(b)(4)); by an additional 2 levels because the offense involved the use of a computer (U.S.S.G. § 2G2.2(b)(6)); and by an additional 5 levels because the offense involved more than 600 images (U.S.S.G. § 2G2.2(b)(7)(D))– for a total Adjusted Offense Level of 37. See PSR ¶¶ 38-51.  With a three-level decrease for acceptance of responsibility, the defendant's total offense level is 34.

4.      With a criminal history category of I, the defendant's guideline range for imprisonment is 151 – 188 months, according to the Presentence Investigation Report.  See PSR ¶ 123.

---

[2]  As part of the plea agreement, the parties further agreed that, with respect to all other aspects of sentencing – including, but not limited to, the term of supervised release, fine, special assessment, restitution, sex offender registration and forfeiture – the Court retains full discretion and authority to impose sentence as required by law and as it deems appropriate, and the parties may request that such additional aspects of sentencing be included as part of the defendant's sentence.

5.      The government requests that this Court accept the 11(c)(1)(C) plea in this case and sentence the defendant to 125 months incarceration – followed by at least 120 months (10 years) of supervised release.

## II.     FACTUAL BACKGROUND

6.      At the time of his plea, the defendant acknowledged certain relevant criminal conduct by signing a factual proffer. Specifically, the defendant admitted, under oath, to the following:

7.      On September 23, 2011, a cooperating witness with a pending case, acting as a confidential human source (CHS), provided information on an individual named "Jorge" – who was later identified by law enforcement as the defendant, Jorge Rodriguez. CHS indicated he/she met the defendant online approximately 1 ½ to 2 years ago and noted that they have had a continual relationship online and via telephone. CHS advised that the conversations with the defendant surrounded their mutual interest in child pornography, and noted that CHS has met the defendant in person and has copied the defendant's collection of child pornography.

8.      Starting on September 29, 2011, and continuing through early February 2012, the defendant and CHS engaged in a series of communications through recorded one-party consent telephone calls and text messages. During the course of these communications, the defendant and CHS discussed their mutual interest in child pornography, including that both had purged prior collections due to the arrest of a mutual friend who was found in possession of child pornography. During one of the recorded telephone calls, the defendant noted that he had purged his collection, but stated further, "In retrospect I wish I hadn't gotten rid of it." The defendant also referenced a potential new source who would provide him with another collection – one that the new source had

told the defendant would make the defendant's prior collection appear "meager." The defendant told the CHS that if the new source "come[s] through, what I'll do is make you a copy."

9. During the communications, the defendant and CHS also discussed the safest way to get CHS a copy, and the defendant offered to send CHS a hard-drive containing the child pornography.

10. During the recorded telephone calls, the defendant repeatedly referenced his efforts to reconstitute his child pornography collection through additional new sources. During one particular call on November 4, 2011, the defendant reiterated that he wished he had kept his original collection and that if one of his potential new sources comes and brings some material, "of course I'll take it."

11. On December 10, 2011, the defendant sent a text message to CHS and said, "Hey. Give me a call if not tonight, tomorrow. Need to send you your xmas present."

12. During a subsequent recorded telephone call on December 19, 2011, the defendant stated that he had obtained a copy of the "mirror" hard-drive with a "lot of good stuff" – relating to the child pornography. The defendant also told CHS, "I could send you a copy of the mirror if you want me to," and discussed possible encryption methods about which he believed many investigators were unaware.

13. During a recorded telephone call on January 26, 2012, the defendant stated he had his copy of the child pornography collection, but not CHS's copy. According to the defendant, he added a little more to the collection, but not much. The defendant also noted that he had recently reconnected with someone he knew approximately three to four years ago who has strong connections in Mexico and may be able to get more child pornography. The defendant stated that

"once you have the video, it'd be great, once you have a whole copy you can just pass it around." The defendant stated further that he would get it in the mail the next day, noting that "the one I have is done for a PC, is netted for a PC," and "if you have a PC you will be able to make as many copies as you want." The defendant added, "[T]he drive is 500GB, but I don't think it's taking up over 200 GB." When CHS inquired if the drive would be encrypted, the defendant responded it would not be, because "if you copy it while encrypted, you may not transfer all." The defendant said he would go to UPS to ship it out, possibly in two packages, one with the hard drive and one with the connector cables. After the call, CHS sent the defendant a text message with the address in Washington, D.C. to use to mail CHS the package.

14. On January 30, 2012, CHS sent the defendant a text message to see if he had sent out the package – to which the defendant responded, "It should be traveling today. I'll send the tracking #." The defendant thereafter provided the tracking number and stated that the package would arrive via next day air. The defendant also texted, "No need to send back since I made back up. I'll pick up when I get there." The defendant also provided CHS with a tracking number that could be used to track the shipment through UPS.

15. Upon entering the provided tracking number on the UPS website, law enforcement learned that the tracking information indicated the package had been mailed from San Rafael, CA on January 30, 2012, and had arrived in Washington, D.C. on January 31, 2012.

16. On February 1, 2012, a law enforcement agent picked up the package sent by the defendant to a location in Washington, D.C., which was the same address provided by CHS. Upon opening the outer packaging, there was a brown package found inside with the name "J. Rodriguez" and the defendant's home address in Point Richmond, CA noted as the return address. Found inside

of the inner brown packaging was a Blue Seagate Free Agent GoFlex Hard-Drive (S/N NA037W0H). A forensic analysis of the blue hard-drive identified approximately 139 GB of files that were consistent with child pornography. Specifically, the hard-drive contained more than 2,500 total videos, the majority of which constitutes child pornography. Included among the video files contained on the hard-drive were the following: (i) video labeled "!!NEW!!! ANrb-Private (anal fuck 4yr) (SELECTIVE TRADE).mpg", depicting a pre-pubescent child being anally penetrated by an adult penis; (ii) video labeled "!!NEW-MOV01889[10yo(mystery) Boy sucks man real good](03.11).1.MPG", depicting a pre-pubescent male child who was blind-folded and performing oral sex on an adult penis; (iii) video labeled "[boy+man] !!!!!!! 6-7yo boy strip, suck, fucked by man – trazcollection!.MPG", depicting a pre-pubescent male child masturbating his own penis, performing oral sex on an adult penis and being anally penetrated by an adult penis; (iv) video labeled "3yo BOY fucked in the ass by man (2007).avi", depicting a pre-pubescent male child being anally penetrated by an adult penis; and (v) video labeled "5yo sucks dads dick in the shower – spits out cum – pthc gay boy pedo 02.46 (19.6Mb).mpg", depicting a pre-pubescent male child performing oral sex on an adult penis.

17.     On February 1, 2012, CHS sent the defendant a text message to inform him that he had received the package and had enjoyed the material. The defendant replied, "Great. But would you agree it's not an exact copy?" and further, "Btw we need to plan a trip to Mexico DF."

18.     During a subsequent recorded telephone call on February 8, 2012, CHS thanked the defendant for the present and the defendant stated there should be more to acquire – along the lines of a terabyte of material.

19.     On February 24, 2012, law enforcement agents arrested the defendant at his residence in Point Richmond, California, pursuant to a federal arrest warrant issued in Washington, D.C. Simultaneous to the defendant's arrest, and in the time period that followed, law enforcement agents executed a search on the defendant's residence pursuant to a search warrant. During the search, law enforcement recovered, among other items, a Seagate Free Agent GoFlex Hard Drive (S/N NA0ESA1C); a White Apple iBook G4 Computer (Model A1055, No Visible S/N); a Sandisk Cruzer Thumb-Drive (4GB); a DT101 G2 Thumb-Drive (4GB); a Kingston Datatraveler G3 Thumb-Drive (8GB); and an Apple 16GB iPhone Cellular Telephone (Model A1303).

20.     Pursuant to the authority of the earlier search warrant, law enforcement conducted a forensic review of the computer and computer media items. Law enforcement also reviewed the contents of the cellular telephone, which was the same device that the defendant had used in his phone call and text message communications with CHS, and which also revealed a contact listing for CHS that provided the same address in Washington, D.C. to which the defendant mailed the blue hard-drive containing child pornography. The forensic analysis of the computer devices and the cellular telephone revealed the presence of numerous images and videos of child pornography, many of which were identical to the videos contained on the Blue Seagate Free Agent GoFlex Hard Drive (S/N NA037W0H) that the defendant sent to CHS on January 30, 2012. The defendant's collection of child pornography included numerous images and videos depicting prepubescent children engaged in sexual acts, including performing oral sex on an adult male penis or being penetrated by an adult male penis.

### III. GOVERNMENT'S SENTENCING RECOMMENDATION

#### A. Application of the Federal Guidelines post-*Booker*

1. In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 125 S. Ct. at 756.

2. As the Supreme Court has stated, a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in Title 18, United States Code, Section 3553(a). Id. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

B.  **Basis for Government's Recommendation**

3.  The government submits that the agreed-upon sentence of 125 months of incarceration, is appropriate and warranted in this case.

*Nature and circumstances of the offense*

4.  The defendant's conduct in this case and the desires as he expressed them to the CHS are beyond troubling on multiple levels. The defendant possessed and trafficked an enormous collection of child pornography. The defendant's mere possession of these images and videos alone helped maintain an underground market for some of the most offensive and pernicious visual content that exists in our society. The defendant's shipping of a hard-drive filled with images and videos of child pornography to a person with whom he had previously shared child pornography, and who the defendant clearly understood to share his interest in child pornography, further helped perpetuate and feed a demand for these images, which included a multitude of videos that depicted prepubescent children being anally penetrated by an adult penis and or performing oral sex on an adult penis.

5.  Moreover, as the defendant acknowledged in the Statement of Offense, the collection of child pornography that he shipped to Washington, D.C. consisted of more than 2,500 total videos, the majority of which constitutes child pornography. Statement of Offense, at ¶ 10. Moreover, in a subsequent exchange, the defendant noted that there would be more child pornography to acquire – along the lines of a terabyte of material. See id., at ¶ 12. The defendant also noted that the hard-drive he had sent to the CHS was "not an exact copy" – seemingly referencing a previous collection of child pornography that the defendant had given the CHS in the past. See id., at ¶ 11.

6.      In his communications with the CHS, the defendant also specifically discussed the further distribution and dissemination of the child pornography that he would be sending to the CHS. In particular, the defendant told the CHS, "Once you have the video, it'd be great, once you have a whole copy you can just pass it around." The defendant explained further that the hard-drive on which he loaded the materials was "netted for a PC" and "if you have a PC you will be able to make as many copies as you want." See id., at ¶ 7.

7.      The harm posed by the defendant's actions is clear. As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole. It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults. Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10. The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions." Id. at 759 n.10. As the Fifth Circuit similarly concluded, the crimes of a "'passive' child pornography recipient" are not "somehow attenuated as compared to a person who actually produces or distributes child pornography . . . victimization of a child depicted in pornographic material flows just as directly from the crime of knowingly receiving child pornography as it does from the arguably more culpable offenses of producing or distributing child pornography." United States v. Norris, 159 F.3d 926, 930 (5th

Cir. 1998). After all, "the 'victimization' of the children involved does not end when the pornographer's camera is put away. The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in those materials to suffer as a result of his actions" Id. at 929.

8.  This horrific impact and victimization is further evidenced in the Victim Impact Statements submitted to the Court under seal with respect to certain "known victims" of the child pornography possessed and transported by the defendant. As noted therein, the impact of the events that led to the creation of those images ultimately possessed and transported by the defendant reached far beyond any conceivable or articulable pain and suffering – reaching depths that no child, and no human being, should ever have to experience. As one child victim described in a Victim Impact Statement (attached at page 1 of the separately filed submission),

> "To think there are pictures being sent all over the country of me is devastating. I am angered that those pictures of me have spread over the Internet and that people think they can take advantage of a child who has already been sinned against. Will someone recognize me someday? Will my girlfriend think something is wrong with me? Will I have a job interview and will they recognize me? In a strange way, the distribution of pictures makes this a crime that never stops. Where and when will this end?"

As a parent of a "known series" victim of child pornography described in a Victim Impact Statement submitted on behalf of her son (attached at pages 6-7 of the separately filed submission),

> "I know these images will never leave cyberspace because once it is out there it is there for good, but my only hope is that someday it will slow down and stop being transferred around from computer to computer so much."

Another parent of a child victim explained further in a Victim Impact Statement (attached at page 9 of the separately filed submission),

11

> "The production of these videos/pictures was abhorrent and I feel that she has suffered immensely over this but anyone who views these pictures and/or videos should be held just as accountable because he or she is exploiting an innocent child. These people have no concern for the trauma they are causing this young child now and in the future. . . . Anyone viewing these videos/pictures is just as guilty for causing this child undue harm, unneeded stress and insecurity in a time when she needs to feel safe to recover."

As another child victim (now a grown adult) described in a Victim Impact Statement (attached at page 13 of the separately filed submission),

> "They are trading around my trauma like treats at a party and it feels like I am being raped all over again by every one of them. It sickens me to the core, terrifies me and makes me want to cry. So many nights I have cried myself to sleep thinking of a stranger somewhere staring at their computer with images of a naked me on the screen. I have nightmares about it often. I can never feel safe so long as my images are out there; every time they are downloaded I am exploited again, my privacy is breached, and I feel in danger again. I fear that any of them may try to find me and do something to me."

The same child's stepfather added some additional thoughts and perspectives in a Victim Impact Statement that he submitted on his child's behalf (attached at page 23 of the separately filed submission),

> The sad fact is this doesn't end, because my daughter's images will be out on the internet forever, continually reminding her and us of how fragile we all are. The internet is such a powerful tool, but child pornography, and how it perpetuates the re-victimization of children is an extreme consequence to our society as a whole, but specifically to our vulnerable children. Our society views our children as precious little gifts that we should love and protect. Some sick, perverted individuals use the internet as their evil play ground to share and use in their sick, fantasy world. They choose to do this. They choose to push the buttons. They make a decision to download and view."

The defendant's criminal actions in this case – although distinct from the actual sexual abuse of the victims itself – nevertheless remains a continuing victimization of these children.

9. Equally concerning to the defendant's transportation of child pornography in this case are his additional statements during a call with the CHS on February 8, 2012, during which

12

the defendant referenced a "very short play session" involving "a little minor petting here and there" with what appears to be a minor child, as described in the Presentence Investigation Report.  See PSR ¶ 29.  Similarly concerning were certain of the text messages recovered from the defendant's cell phone following his arrest, as also referenced in the Presentence Investigation Report, in which the defendant appears to engage in a sexually related discussion with an individual identified as "Paul," concerning the defendant's niece, as well as methods to avoid detection while transferring child pornography.  See PSR ¶¶ 32-33.

### *History and characteristics of the defendant*

10.     The defendant is a 45-year old man with no criminal history, a good history of education and employment, a relatively stable family life, and some history of substance abuse.  The defendant also suffers from rather serious medical conditions, as described in the Presentence Investigation Report.  See PSR ¶ 77 – 87.  Although unfortunate and tragic, this by no means excuses the defendant's egregious conduct in this case.  Indeed, the defendant's life experience and medical history, as described in the PSR – although very difficult at points – make his actions in this case even more troubling, as there seems to be no explanation or mitigation for his criminal behavior, other than a sexual interest in children.

### *Punishment, deterrence, protection, and correction*

11.     As described in detail above, the offense at issue in this case is extremely serious and the sentence imposed should reflect that fact.  The defendant's transportation of child pornography and his sexual interest in children, is of enormous concern and poses an identifiable and significant danger to the community.  The defendant's actions in this regard were egregious and justice requires that they be appropriately punished.  The recommended and agreed-upon

period of incarceration would provide that punishment and simultaneously deter future criminal conduct. Additionally, incarceration would protect the community by incapacitating the defendant for a definitive period of time. Correctional treatment, as well as any necessary medical care, would be available to the defendant through the U.S. Bureau of Prisons.

### *Available sentences*

12.     The government submits that incarceration is the most appropriate sentence available for the defendant because it will incapacitate him for a determined period of time. A term of supervised release of not less than ten years, with the conditions recommended in the PSR, would also be appropriate to ensure that the defendant is monitored and the community is protected. The defendant, who is currently 45 years old, will need close and extensive monitoring whenever he ultimately is released from prison.

13.     To his credit, the defendant noted a willingness to accept responsibility at an early stage of the proceedings, even prior to his transport to Washington, D.C. following his arrest in California. In addition, the defendant also demonstrated interest in providing further assistance relative to his full acceptance of responsibility, for which additional details can be provided at the time of sentencing. The defendant thereafter entered a guilty plea on November 16, 2012 – a disposition that allowed the defendant to demonstrate acceptance of responsibility, and which afforded the Court and the government the benefit of preserving resources.

14.     For all of the reasons set forth above, the government respectfully requests that the Court accept and approve the parties' agreed-upon sentence of 125 months incarceration, pursuant to Fed. R. Crim. P. 11(c)(1)(C) (with respect to the incarceration aspect of sentencing), to be followed by at least 120 months (10 years) of supervised release with the condition that the

defendant undergo intensive sex offender treatment, as well as all additional conditions deemed appropriate by the Court and by U.S. Probation, including conditions relating to computer and internet usage and contact with children. This sentence strikes an appropriate balance between the seriousness of the offense, the danger posed to the community, the need for just punishment, deterrence of criminal conduct, and protection of the community, with the history and characteristics of the defendant.

15. In addition, the government also respectfully requests, per the submission by counsel for the "known series" victim identified as "Vicky," that a no contact order be issued and that the defendant have no contact with "Vicky." The government also respectfully requests that the Court order restitution to "Vicky," as detailed further in the government's separately filed Request for Restitution.

## IV. <u>CONCLUSION</u>

Wherefore, the government respectfully submits that a sentence of 125 months of incarceration be imposed, with a period of supervised release of at least 120 months (10 years), including the conditions recommended in the Presentence Investigation Report.

RONALD C. MACHEN JR.
United States Attorney

BY:    /s/
DAVID A. LAST
Assistant United States Attorney
D.C. Bar 476335
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7389
David.Last@usdoj.gov